J-S79014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.L., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: J.D.L., SR., NATURAL FATHER | |
| | No. 1405 MDA 2018 |

Appeal from the Order Entered July 25, 2018
In the Court of Common Pleas of Franklin County Criminal Division at
No(s):  41-Adopt-2018,
CP-28-DP-0000061-2016

| | |
|---|---|
| IN RE: ADOPTION OF: J.L., III, A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: J.L., II, NATURAL FATHER | |
| | No. 1406 MDA 2018 |

Appeal from the Decree Entered July 25, 2018
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s):  41-Adopt-2018


BEFORE:  SHOGAN, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY SHOGAN, J.:               **FILED JANUARY 24, 2019**

J.L., II ("Father"), appeals from the July 25, 2018 order of the Court of

Common Pleas of Franklin County changing the placement goal regarding his

son, J.L., III ("Child"),[1] born in August of 2009, to adoption.  In addition,

Father appeals the July 25, 2018 decree involuntarily terminating his parental

rights to Child.[2]  After careful review, we affirm.

We summarize the relevant factual and procedural history, as follows.

On August 16, 2016, at the request of Father's paramour, who had custody of

Child[3] because Father was incarcerated for drug-related crimes, Child was

placed in the custody of the Franklin County Children and Youth Services ("the

Agency" or "CYS").  Orphans' Court Opinion, 9/13/18, at 2–3.  At the time,

Father's paramour complained that Child had behavioral problems that she

could not control.  *Id*. at 2; N.T., 7/24/18, at 29–30.  The juvenile court

adjudicated Child dependent on August 25, 2016, and established his

permanency goal as reunification.  Orphans' Court Opinion, 9/13/18, at 3.

Approximately two months later, on October 28, 2016, Father was

released from prison and permanency review hearings occurred at regular

---

[1]  We note that Child is referred to as J.L., Jr., at Docket Number CP-28-DP-0000061-2016, and as J.L., III, at Docket Number 41-Adopt-2018.

[2]  By separate decree on July 25, 2018, the orphans' court involuntarily terminated the parental rights of A.P. ("Mother").  Mother did not file a notice of appeal.

[3]  The record reveals that, at the time of Child's placement, Mother's whereabouts were unknown to the Agency.  N.T., 7/24/18, at 30–31.  The Agency subsequently learned that Mother resided in the State of Maryland, and that Child had not seen Mother since May of 2014, when he was four years old.  *Id*. at 32.  Child began residing with Father in 2011, until Father's incarceration in May of 2016.  Orphans' Court Opinion, 9/13/18, at 2; N.T., 7/24/18, at 16.

intervals. N.T., 7/24/18, at 48–49. Father was required to satisfy the following Family Service Plan ("FSP") objectives: participate in a drug and alcohol evaluation and comply with all recommendations; participate in a parental fitness evaluation and comply with all recommendations; refrain from future criminal activity and comply with all terms of his probation; maintain consistent visitation and contact with Child; and maintain stable housing and employment. Orphans' Court Opinion, 9/13/18, at 3. In August of 2017, based upon new drug-related charges, Father was re-incarcerated, where he remained at the time of the subject proceedings. N.T., 7/24/18, at 51.

There is testimonial evidence that Child suffered physical abuse prior to his placement with CYS. Child alleged that two adults, who are not identified in the record, had been physically abusive toward him. N.T., 7/24/18, at 89. In his initial foster placement, Child displayed severe behavioral problems. In January of 2017, following inpatient hospital treatment and a diagnostic evaluation, Child was placed in a residential treatment facility. *Id.* at 57–58. Child's behavioral problems, including outbursts that apparently necessitated the use of restraints, continued while he was in the residential treatment facility. *Id.* at 58–59. Child's treatment team opined that his behaviors were caused by his lack of "family connections" and "not having anybody visiting him or calling him." *Id.* at 59. Following successful visits with potential foster parents who were willing to provide permanency, Child was discharged on June 18, 2018, and placed with the foster parents. *Id.* at 58.

On July 12, 2018, CYS requested that the court change Child's placement goal to adoption, and it filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). On July 24, 2018, the court held a combined goal-change and involuntary-termination hearing during which the Agency presented the testimony of caseworker, Hannah Crean. N.T., 7/24/18, at 27–92. Father testified *via* telephone from prison. Father stated that he anticipated being released from prison to a drug-program facility in approximately one month, where he would then reside for an unspecified time. *Id.* at 5.

During the hearing, Child, then nearly nine years old, was represented by Kristen Hamilton, Esquire, who served as his guardian *ad litem* ("GAL") in the dependency matter. The trial court appointed the same attorney to represent Child's legal interests in the involuntary termination matter.[4]

_____

[4] Pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel, who discerns and advocates for his legal interests, which our Supreme Court has defined as the child's preferred outcome. *See In re T.S.*, 192 A.3d 1080 (Pa. 2018) (citing *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017)). The *T.S.* Court held, "[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests." *T.S.*, 192 A.3d at 1092.

Because the right to counsel belongs to the child, who is unable to address a deprivation of his right to counsel on his own behalf, we must address this issue *sua sponte*. *See In re Adoption of T.M.L.M.*, 184 A.3d 585, 588 (Pa.

By permanency review order entered on July 25, 2018, the court changed Child's placement goal to adoption. By decree the same date, the orphans' court involuntarily terminated Father's parental rights. On August 22, 2018, Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court filed its Rule 1925(a) opinion on September 13, 2018.

On appeal, Father presents the following issue for our review:

> [Whether] [t]he trial court abused its discretion in terminating the parental rights [of Father] and changing the goal of adoption of [Father] where, although incarcerated, [Father] had sent letters to his son, thus **not** evidencing a settled purpose of relinquishing his parental claims to the child; and he testified that

_____

Super. 2018) ("This Court must raise the failure to appoint statutorily-required counsel for children *sua sponte*, as children are unable to raise the issue on their own behalf due to their minority.") (citing ***In re K.J.H.***, 180 A.3d 411, 414 (Pa. Super. 2017)).

Instantly, prior to the subject proceedings, Attorney Hamilton, then Child's GAL, filed in the orphans' court an Affidavit of Non-Conflict declaring that no conflict would exist if the court appointed her as Child's legal counsel in the contested involuntary termination proceeding. By order dated July 12, 2018, the court appointed Ms. Hamilton as Child's counsel.

Upon review, we conclude that Attorney Hamilton's representation of Child satisfied the requirements of 23 Pa.C.S. § 2313(a) insofar as the testimonial evidence indicates that Child's legal and best interests were not in conflict. ***See*** N.T., 7/24/18, at 84 (Child asked the Agency caseworker if his foster parents "can be his mom and dad."). At the conclusion of the testimonial evidence, Attorney Hamilton argued in favor of the involuntary termination of Father's parental rights stating, "I think [Child] deserves to be heard now, and he is making his wishes known that he would like to attempt permanency with this [foster] family." ***Id.*** at 148.

he would soon be released from incarceration, and only then would he have the opportunity to remedy the conditions that led to placement of the child and to fulfill the requirements set by the Agency for reunification[?]

Father's Brief at 5 (emphasis in original).

We review Father's issue regarding the involuntary-termination decree[5] according to the following standard:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

_____

[5] In his Pa.R.A.P. 1925 statement, Father indicated that he is appealing both the termination of his parental rights and the trial court's decision to change Child's permanency goal to adoption. In the body of his brief, however, Father has abandoned any argument relating to the goal-change determination. Father does not pursue a claim that the orphans' court erred in changing Child's goal to adoption and fails to provide argument or citation to any relevant legal authority regarding the goal-change order. *See Banfield v. Cortes*, 110 A.3d 155, 168 (Pa. 2015) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of an appellate court to formulate [an] appellant's arguments for him." *Wirth v. Commonwealth*, 95 A.3d 822, 837 (Pa. 2014)); *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief."); *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that issues are waived if appellate brief fails to provide meaningful discussion with citation to relevant authority); *see also* Pa.R.A.P. 2119(b). Moreover, even if not waived, we would affirm the trial court's decision to change the goal based upon the thorough Pa.R.A.P. 1925(a) opinion. Orphans' Court Opinion, 9/13/18, at 14–16.

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the decree pursuant to 23 Pa.C.S. § 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental,

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b).[6] *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted).

---

[6] Based on this disposition, to the extent Father argues that the trial court abused its discretion in terminating his parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8), we need not review those sections. Nevertheless, we observe that termination pursuant to Section 2511(a)(5) and (8) was not proper with respect to Child because he was not removed from Father's care. *See In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care).

It is well established that Section 2511 does **not** require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 91 (Pa. 1998). Rather, parental rights may be terminated pursuant to Section 2511(a)(1) "if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties." ***Id.*** (emphasis in original).

Our Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

***Id.*** (citations omitted).

With respect to the performance of parental duties of incarcerated parents, our Supreme Court has explained as follows:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where

the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (quoting *In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975) (footnotes and internal quotation marks omitted)).

We have stated:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, we have explained that the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Z.S.W.*, 946 A.2d at 730 (quoting *Adoption of Charles E.D.M.*, 708 A.2d at 92).

Regarding the performance of his parental duties, Father asserts on appeal that he was not given sufficient time to complete his FSP objectives. Father's Brief at 16. He requests the opportunity to complete the required objectives upon his release from prison, which he testified would be in approximately one month. *Id.* In addition, Father contends that while incarcerated, he sent notes to Child. *Id.* at 11. Therefore, he maintains that he did not evidence a settled purpose of relinquishing his parental rights. *Id.* We conclude that Father's assertions are without merit.

The trial court found as follows, in relevant part:

Between Father's release from prison in October of 2016 and his re-imprisonment in August of 2017, Father was tasked with concrete objectives which, upon completion, would reunite him

> with [Child]. However, while Father made initial progress toward these goals by participating in both the drug and alcohol evaluation and the parental fitness evaluation, Father did not complete the recommendations prescribed by either evaluation. Father was also directed to refrain from criminal activity and comply with his probation; instead, Father violated his probation and returned to prison.

Trial Court Opinion, 9/13/18, at 12–13. The testimonial evidence supports the orphans' court's findings.

At the time of the instant proceedings, Child had been in placement for twenty-three months. N.T., 7/24/18, at 6, 11. Father was released from prison for approximately ten months during Child's first year of placement, from late October of 2016, until August of 2017, when he was re-incarcerated on new drug-related charges. *Id.* at 15, 20, 49, 51. The CYS caseworker, Ms. Crean, testified that on November 9, 2016, Father took part in a drug and alcohol evaluation, which resulted in a recommendation for him to undertake intensive outpatient treatment. *Id*. at 49. Although Father attended an initial intake appointment with an outpatient drug and alcohol treatment provider, Father never attended any additional appointments. *Id.* at 49-50.

Likewise, Father underwent a parental fitness evaluation, which resulted in recommendations for him to participate in a bonding assessment regarding Child; to understand and to be fully involved in Child's mental health treatment; to obtain and maintain financial stability; and to participate in individual outpatient therapy. N.T., 7/24/18, at 50. Father did not pursue any of these recommendations except for being involved for an unspecified

period in Child's mental health treatment. Specifically, Father participated in biweekly family therapy sessions by telephone with Child. *Id.* at 51–52. However, Ms. Crean testified on direct examination as follows:

Q. Was [Father] engaged in the [therapy] process [with Child]?

A. The therapist did struggle to initially get [Father] on the phone most times and then keep him engaged on the phone due to the fact that his son didn't really want to talk on the phone much so [Father] . . . was pretty disinterested most times.

*Id.* at 52. Importantly, Father testified that he has had no contact with Child's therapist since August of 2017. *Id.* at 20–21.

With respect to visitation, Ms. Crean testified that the Agency transported Father to visit Child in the residential treatment facility an unspecified number of times. N.T., 7/24/18, at 55. She testified that the Agency stopped transporting Father on March 9, 2017, because Father was "swearing at the caseworkers due to the fact that there were two [people] to transport him. [Father] thought that was disrespectful and then [Father] just refus[ed] to . . . sit in the car where he was supposed to and made some derogatory comments racially towards the caseworker." *Id.* at 55.

Finally, Father did not maintain financial and housing stability during the months that he was released from prison. Ms. Crean testified that in March of 2017, Father informed the Agency that he was no longer employed. N.T., 7/24/18, at 51. Moreover, in April of 2017, Father told CYS that he was going to be evicted from his current residence and planned to stay with friends and family until he obtained new employment and new housing. *Id.*

Thereafter, Father did not comply with his FSP objectives to abide by the terms of his probation and refrain from criminal activity. Specifically, he was arrested and incarcerated in August of 2017, for testing positive for cocaine and fentanyl. N.T., 7/24/18, at 51. On cross-examination by the Agency's counsel, Father testified:

Q. Do you have any concerns about your ability to completely abstain from using drugs or alcohol and staying out of jail?

A. No, ma'am. I mean, I have excuses but last year was like a really rough patch for me, you know what I'm saying. I lost a lot as far as my son getting put in there. . . . I was just going through a real rough time and I didn't use as I did before but I . . . slipped up and wound up using and I paid for it. . . .

*Id.* at 12.

Father acknowledged that when he was not incarcerated, he was hindered from visiting Child in the residential treatment facility. N.T., 7/24/18, at 8. He explained, "[I]t was a rough time for me, like, emotionally. I did my best." *Id.* Father testified that the residential treatment facility "was way out of my way. I was staying in Chambersburg. . . . I didn't really have no [sic] support system over there whatsoever. . . ." *Id.* Nevertheless, Father testified that he was attempting to complete his FSP objectives when he was re-arrested. *Id.* at 6-7.

Ms. Crean further testified that during his current incarceration, Father had written regularly to Child. N.T., 7/24/18, at 53. However, Ms. Crean testified, "[T]he letters are severely edited due to the content of the letters, including explicit lyrics of songs, sexual lyrics and such." *Id.* She explained

that Father was told by Child's treatment team, the Agency, and the trial court that the content of his letters was inappropriate, and after a substantial period, Father's letters to Child improved. *Id.* at 53–54. Moreover, Father testified that he has not spoken to Child on the telephone for approximately one year. *Id.* at 24.

Father acknowledged on cross-examination by Child's attorney that he is aware that Child has significant delays in his cognitive and developmental abilities. N.T., 7/24/18, at 21. With respect to Child's behavioral issues, Father testified regarding his responsibility for them, as follows:

> [By CYS counsel:] You are aware, correct me if I'm wrong, about the severity of [Child's] behavior, including threatening, being aggressive towards others, harming himself, harming other adults, harming other children, his aggression, you're aware of all that?
>
> [Father:] Yes, ma'am.
>
> Q. And you're aware, also, that permanency reviews, it was discussed that perhaps some of the aggression was the fact that there was no consistency from specifically you?
>
> A. Yeah, yeah. When I had him, I did the best I could do. Unfortunately, . . . I had to move and then I moved to another place. I took my son camping with me, I came back and it was broken into, you know what I'm saying. I was going to stay there so I was trying to find another place and we was, you know, staying house to house. And unfortunately, I don't have the support system I would like to have from my family but I do the best I can do.

*Id.* at 21–22.

Based on the totality of the record evidence, we discern no abuse of discretion by the trial court in concluding that, for a period far in excess of the

six-month statutory minimum, Father failed to perform his parental duties to Child. Accordingly, we affirm the decree pursuant to 23 Pa.C.S. § 2511(a)(1).

With respect to 23 Pa.C.S. § 2511(b), this Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Turning to Section 2511(b), although Father does not present a challenge to this section, we consider it based on the requisite bifurcated analysis in involuntary termination matters. **See In re C.L.G.**, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). We have explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. **In re K.K.R.S.**, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. **See In re T.D.**, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the

- 15 -

orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." ***In re Adoption of T.B.B.***, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in ***In re A.S.***, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***T.S.M.***, 71 A.3d at 268. The ***T.S.M.*** Court directed, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id.*** at 269. Moreover, the High Court observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Instantly, the orphans' court found as follows with respect to Child's best interests:

> Due to various issues, including but not limited to serial periods of incarceration, [F]ather has been unable to meet his son's needs. Most critical to [Child's] well-being are the issues

- 16 -

addressed by the . . . []residential treatment facility placement]—[Child's] need for <u>family connections</u>. In fact, [Child] was released from the [residential treatment facility] to foster care to have this significant mental health issue addressed. Based on past behaviors and demonstrated lack of commitment to the stability critical to [Child's] positive development, this [c]ourt has no faith that [F]ather will be in a position to meet his son's needs in the future. Family connections are essential for [Child]. The foster family is presently providing these connections and has stated their willingness to continue to do so long[-]term. His needs are now being well met.

Decree, 7/25/18, at 6, ¶ 7(ll) (emphasis in original). The testimonial evidence supports the orphans' court's findings.

Ms. Crean testified that Child is diagnosed with disruptive dysregulation, mood disorder, and attention deficit hyperactive disorder. N.T., 7/24/18, at 53. He receives family-based therapy in his foster home as well as psychiatric treatment. *Id.* at 91. Child has an Individualized Education Plan, and Ms. Crean testified that although nearly age nine at the time of the involuntary termination proceeding, Child is at a kindergarten or remedial first grade educational level. *Id.* at 90. Significantly, Ms. Crean testified as follows on direct examination:

[By CYS:] Is there anything in particular that [Child's] treatment team has repeatedly expressed that [Child] needs to help him cope and deal with the issues that he's suffered throughout his life?

[By Ms. Crean:] Yes. Family connections is the biggest one. They continue to reiterate to [Father] as well as us that [Child] just needs those connections to be able to be successful in his treatment.

Q. And has [Father] appeared to understand the importance of this for [Child]?

A.   He has not.

Q.   And why do you say he hasn't?

A.   He . . . has not continued to maintain that contact with his son, to be a resource for his son or [to] provide other family resources for his son.

*Id.* at 54.

Ms. Crean testified that although a bond initially existed between Child and Father, that bond has weakened over the past six to eight months. N.T., 7/24/18, at 83–84. She explained that Child "is very angry that Father doesn't keep him safe. That's something that he continues to reiterate and wants a mom and a dad that will want him and keep him safe." *Id.* at 84. Ms. Crean testified that Child "seems very clearly bonded to" his foster parents. *Id.* at 63. She testified, "If he's struggling with something, he goes to them for help. They're there to comfort him when he needs it." *Id.* In fact, Ms. Crean stated that Child has asked her whether his foster parents "can be his mom and dad." *Id.*

The record evidence clearly demonstrates that Child suffers from the lack of family stability and permanency in his life. Prior to his discharge from the residential treatment facility, Child participated in overnights with the foster parents, during which he displayed "no behaviors whatsoever. He was just very happy to have a family to visit with," according to Ms. Crean. N.T., 7/24/18, at 59. She testified, in part, that Child currently "is showing some of the breakdowns and discussing some of his trauma with [foster parents,]

so they are seeing some of the outbursts but as well as the really good stuff."

*Id.* at 62. The foster parents continue to be willing to provide permanency for him. *Id.* Because the testimonial evidence supports the orphans' court's decision that Child's developmental, physical, and emotional needs and welfare necessitate the involuntary termination of Father's parental rights, we affirm the decree pursuant to Section 2511(b).

Goal change order affirmed. Decree terminating parental rights affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/24/2019